IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 07–cv–00331–EWN

ROGER MARSHALL,

      Plaintiff,

v.

LINDA S. MCMAHON, Acting
Commissioner of Social Security,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

This is a social security benefits appeal. Plaintiff Roger Marshall challenges the final

decision of the Commissioner of Social Security (the "Commissioner") denying his application for

social security disability and supplemental security income benefits. Jurisdiction is premised upon

42 U.S.C. § 405(g).

## FACTS

### 1. *Medical Evidence*

Plaintiff was born on November 17, 1944, and was fifty-seven years old at the onset of his

alleged disability. (Admin R. at 56 [filed Apr. 27, 2007] [hereinafter "Admin R."].) Plaintiff has a

high school education and has worked in the vocationally relevant past as a truck driver and

forklift operator. (*Id*. at 572–73, 576.) Plaintiff alleges he became unable to work on January 27,

2002, due to the effects of a stroke, depression, a knee problem, a heart problem, and numbness in his hands and feet caused by diabetes.[1] (*Id*. at 66, 588.) I first present the medical evidence as it pertains to each of Plaintiff's alleged impairments, and then summarize the various residual functional capacity ("RFC") assessments on record.

### a. Treatment Records

#### i. Diabetes and Numbness in Hands and Feet

In 1998, Plaintiff's primary care physician, Jackie McCollum, M.D., diagnosed Plaintiff with diabetes mellitus. (*Id*. at 268–69.) In December 1998, Dr. McCollum prescribed medication and recommended dietary changes. (*Id*. at 267–68.) From 1998 to 2001, Plaintiff had follow-up visits with Dr. McCollum, during which she ordered additional blood work, adjusted Plaintiff's medication, and prescribed a glucometer. (*See, e.g.*, *id*. at 250, 252, 254, 256.) By October 2001, Plaintiff's blood work had improved, and Dr. McCollum advised him to continue following a low-fat diet and to exercise. (*Id*. at 243.) In February 2002, Dr. McCollum again discussed diet and exercise with Plaintiff. (*Id*. at 239.)

On June 19, 2002, Plaintiff visited the Hoffman Heights Medical Clinic, where his healthcare provider noted decreased sensation in the toes of his right foot. (*Id*. at 198.) On July 12, 2003, a neurological exam revealed slight sensory defects in both feet. (*Id*. at 162.)

---

[1]Plaintiff's medical history also contains indications of gout, pancreatitis, arthritis, hypertension, gastroesophageal reflux disease, and other ailments. Nonetheless, because (1) the Commissioner found some of these ailments to be "non-severe," and (2) Plaintiff neither disputes this determination, nor argues that any of these other ailments — either individually or in combination — demonstrates his disability, I omit reference to Plaintiff's other ailments. (*See* Admin R. at 21; Pl.'s Opening Br. [filed July 7, 2007] [hereinafter "Pl.'s Br."].)

Between June and August 2003, Plaintiff visited Hoffman Heights Medical Clinic four times, during which he was treated for diabetes, along with his other ailments. (*Id*. at 192–95.)

Throughout 2004, Plaintiff received treatment for diabetes at a Veteran's Administration ("VA") clinic. (*Id*. at 348–86.) During at least two of these visits, Plaintiff complained of pain and numbness in his hands and feet. (*Id*. at 377, 359.) Plaintiff was given an "Accucheck" home machine to test his blood glucose levels, and was repeatedly advised of the importance of proper diet and exercise. (*See, e.g.*, *id.* at 362, 370, 374.)

### ii. Heart Problems

In September 2000, Plaintiff reported chest pressure to Dr. McCollum. (*Id*. at 261.) A cardiovascular exam revealed nothing unusual, and Plaintiff was diagnosed with "unspecified chest pain." (*Id*. at 259–60.) On August 8, 2003, Plaintiff complained of chest pain to a treating source at Hoffman Heights Medical Clinic. (*Id*. at 192.)

On February 10, 2004, Plaintiff reported chest pain during a visit to the VA clinic. (*Id*. at 379.) The treating physician wanted to do an EKG and stress test, but Plaintiff declined because he had reportedly undergone such tests in the previous two years with negative results. (*Id*.) In August 2004, Plaintiff again complained of chest pain to the VA clinic. (*Id*. at 359.)

In March 2005, Plaintiff underwent a stress test and was found to have myocardial ischemia.[2] (*Id*. at 405.) On October 6, 2005, Plaintiff presented to another VA clinic complaining

---

[2]Myocardial ischemia is a lack of blood caused by narrowing of the coronary arteries. *See* 3–I J.E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE 4377 (Matthew Bender 2005) (hereinafter "DICTIONARY OF MEDICINE").

of chest pain.  (*Id*. at 415–17.)  He was assessed with unstable angina, and was scheduled for a

cardiac catheterization.[3]  (*Id*. at 417.)  After this catheterization revealed coronary artery disease,

Plaintiff underwent a stent placement in his heart.[4]  (*See id.* at 417–27.)  On October 7, 2005,

Plaintiff was discharged with no physical activity limitations.  (*Id*. at 556.)

### iii.    *Depression and Memory Problems*

In June 2001, Plaintiff complained of memory problems to Dr. McCollum.  (*Id*. at 246.) A

neurological examination revealed nothing unusual, and Plaintiff was diagnosed with "reactive

confusion."  (*Id*. at 247.)  An MRI scan revealed "no significant abnormalities."  (*Id*. at 247, 278.)

On January 30, 2002, Plaintiff returned to Dr. McCollum for a "follow-up" on his

depression, and reported improvement in thoughts, decreased levels of stress, and that his family

had noted improvements.[5]  (*Id*. at 240.)  Dr. McCollum increased the dosage of Plaintiff's

antidepressant.  (*Id*.)

---

[3]Angina pectoris constitutes a group of symptoms accompanying the sudden contraction of the smaller arteries which supply blood to the heart muscle.  *See* DICTIONARY OF MEDICINE, *supra* note 2, at 7083.  Cardiac catheterization is the passage of a small catheter into the heart to obtain a sample of blood, determine the pressure within the heart, or detect anomalies in the structure.  *See id*. at 1556.

[4]A stent is a device such as a narrow rod or catheter positioned within a tubular structure, usually in order to maintain an open channel within the structure.  *See* DICTIONARY OF MEDICINE, *supra* note 2, at 6240.

[5]It is unclear from the medical record when Plaintiff first presented to Dr. McCollum with depression.

On June 27, 2002, Plaintiff presented to an emergency room following a "road rage" incident. (*Id*. at 181–89.) He complained of stress relating to the care of his terminally ill wife, and wanted to know if his medicine should be adjusted. (*Id*. at 184.) Plaintiff reported a two-year history of stress, but denied a significant history of depression or anxiety. (*Id.* at 183.) The emergency room physician noted that Plaintiff was "reasonable" and "logical" and did not display overt depressive symptoms. (*Id.* at 185.) The ER physician adjusted Plaintiff's antidepressant medication. (*Id*. at 187.) On July 15, 2002, Plaintiff returned to the emergency room for a refill of his antidepressant prescription. (*Id*. at 175–78.)

On July 15, 2002, Plaintiff reported increased anxiety related to the care of his wife to a health care provider at Hoffman Heights Medical Clinic. (*Id*. at 197.) On August 5, 2002, this same provider diagnosed Plaintiff with recent-onset insomnia and prescribed sleep and anxiety aids. (*Id*. at 196.)

Between June and August 2003, Plaintiff visited Hoffman Heights Medical Clinic four times, during which he received follow-up treatment for depression, along with his other ailments. (*Id*. at 192–95.)

On September 29, 2003, Plaintiff underwent a consultive psychological evaluation by Brett Valette, Ph.D. (*Id*. at 207–09.) Dr. Valette diagnosed Plaintiff with "[n]ormal bereavement with periods of major depression," and noted "complaints of memory impairment, secondary to depression."[6] (*Id*. at 209.) Plaintiff's mental evaluation showed "average range across the board

---

[6]Plaintiff's wife had apparently passed away sometime in early 2003. (*See, e.g.*, Admin R. at 207, 447.)

on all areas of memory functioning" except one, which was "right on the edge of average and low[-]average." (*Id.*)  Dr. Valette opined that Plaintiff's reported memory problems likely resulted from "just some normal aging . . . and . . . his overwhelm [sic] and his depression." (*Id.*)

From September to early November 2003, Plaintiff had counseling sessions at Heritage Christian Center. (*Id.* at 428–49.)  Plaintiff's counselor helped him with stress management, grief, and self-esteem issues. (*See id.* at 446.)

In September 2005, Plaintiff was diagnosed by a social worker with recurrent major depression and was advised to seek counseling. (*Id.* at 412, 414.)  From October 2005 to January 2006, Plaintiff received counseling at the VA clinic. (*See, e.g.*, *id.* at 526–28, 530–31, 537–39, 542, 544.)  A physician assessed Plaintiff with "[a] dismal history of loss and bad luck in recent years," and observed that "[i]t is difficult to know whether his depression is entirely due to circumstances and health issues, or whether there is an endogenous component here." (*Id.* at 545.)

### iv.  *Stroke*

On May 16, 2003, Plaintiff was admitted to the hospital following a stroke. (*Id.* at 172.)  Plaintiff reported numbness and weakness on his left side. (*Id.* at 172, 174.)  He was found to have left-side face droop, double speech, and a limp. (*Id.* at 143.)  On May 20, 2003, Plaintiff was discharged after being deemed a candidate for outpatient rehabilitation. (*Id.* at 144.)

Between May and July 2003, Plaintiff underwent eight physical therapy sessions. (*See id.* at 157–61, 166-70.)  By July 30, 2003, Plaintiff was found to be "completely independent working around the home following normal routines in his recreational activities which include

large amounts of walking." (*Id*. at 157.) Following physical therapy, Plaintiff: (1) could walk for thirty minutes; (2) had a normal gait pattern; and (3) could follow an independent home exercise program. (*Id*.)

In the spring of 2004, Plaintiff reported a weak left arm during a visit to the VA clinic, which his treating physician noted could have been related to his reported stroke. (*Id*. at 377.) By December 2004, Plaintiff complained of numbness in both arms and weakness in his left arm. (*Id*. at 348.)

### v.     Knee Problems

In January 2004, Plaintiff presented to a VA clinic complaining that his right knee had "given out," and caused him pain when he put weight on it. (*Id*. at 386.) Plaintiff was assessed with "right knee pain or discomfort without evidence of joint inflamation." (*Id*. at 385.) He was given a knee support to wear when walking for significant periods of time, and was prescribed pain medication. (*Id*. at 385–86.) On February 5, 2004, Plaintiff reported that his knee felt better during a follow-up visit. (*Id*. at 375.)

### b.     RFC Assessments

### i.     First Mental RFC Assessment

On October 7, 2003, a state agency psychiatrist, Richard B. Garnard, M.D., completed a mental residual functional capacity assessment of Plaintiff and filled out a psychiatric review technique form. (*Id*. at 210–28.) In the latter document, Dr. Garnard found Plaintiff to have: (1) mild restriction on the activities of daily living; (2) moderate difficulty maintaining social functioning; (3) moderate difficulty in maintaining concentration, persistence, and pace; and (4) no

episodes of decompensation of extended duration.  (*Id*. at 224.)  Dr. Garnard further opined that Plaintiff's reported problems with attention, concentration, and inability to follow directions were "far more than would be expected based on the objective evidence."  (*Id*. at 212.)  Dr. Garnard suggested that Plaintiff "should have minimal to no interaction with the general public," and concluded that "while [Plaintiff] clearly does have some limitations, they are not severe enough to prevent all types of work."  (*Id*. at 212, 228.)

### ii. *First Physical RFC Assessment*

On October 20, 2003, a state agency physician completed a physical residual functional capacity assessment of Plaintiff.  (*Id*. at 229–36.)  This unnamed physician found that Plaintiff: (1) could lift or carry fifty pounds occasionally and twenty-five pounds frequently; (2) stand, walk, and/or sit for about six hours each in an eight-hour workday; and (3) was unlimited in his ability to push and/or pull.  (*Id*. at 230.)  This physician further noted that Plaintiff should never climb ropes, ladders, or scaffolds, but could frequently balance, stoop, kneel, crouch, or crawl.  (*Id*. at 231.)

### iii. *Dr. McCollum's Physical and Mental RFC Assessment*

On November 3, 2003, Dr. McCollum wrote a cover letter attending her transmission of Plaintiff's treatment records from 1998 to 2002.  (*See id*. at 237.)  Therein, she stated that complications from Plaintiff's diabetes "alone disqualifies him from ongoing employment as a truck driver."  (*Id*.)  Moreover, Dr. McCollum alluded to Plaintiff's stroke — which had occurred more than a year after her last recorded treatment of Plaintiff — and stated that it had left him with "some problems with his sense of balance and some short-term memory problems."  (*Id*.)

Dr. McCollum opined that Plaintiff's "imbalance makes physically taxing employment unsuitable and even potentially dangerous," and stated that "[Plaintiff's] memory difficulties make learning an entirely new trade problematic as well." (*Id*.)

### iv. Second Physical RFC Assessment

On May 26, 2004, a state agency physician, Kevin Whittle, M.D., completed a physical residual capacity assessment of Plaintiff. (*Id*. at 325–32.) Dr. Whittle found that Plaintiff could: (1) lift or carry fifty pounds occasionally and twenty-five pounds frequently; (2) stand, walk, and/or sit for about six hours in an eight-hour workday; and (3) was unlimited in his ability to push and/or pull. (*Id*. at 326.) Dr. Whittle imposed no postural limitations. (*Id*. at 327.)

### v. Second Mental RFC Assessment

On June 1, 2004, a state agency psychologist, D.J. Soule, Ph.D., completed a psychiatric review technique form on Plaintiff. (*Id*. at 333–46.) Dr. Soule found that Plaintiff's mental impairments were "not severe," noting that Plaintiff had "near total recovery of function" after his stroke and "occasional memory lapses." (*Id.* at 333.) Moreover, Dr. Soule found that Plaintiff had: (1) mild restriction on the activities of daily living; (2) mild difficulty maintaining social functioning; (3) mild difficulty in maintaining concentration, persistence, and pace; and (4) one or two episodes of decompensation of extended duration. (*Id*. at 343.)

## 2. Procedural History

On July 29, 2003, Plaintiff filed applications for disability insurance benefits and supplemental security income benefits. (*Id*. at 56–59, 450–55.) On October 22, 2003, the Social Security Administration denied Plaintiff's applications. (*Id*. at 38, 456.) On June 1, 2004, the

Social Security Administration again denied Plaintiff's applications on reconsideration. (*Id.* at 39, 462.) On July 30, 2004, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 48–49.) On November 17, 2005, the ALJ held a hearing, at which Plaintiff and a vocational expert ("VE") testified. (*Id.* at 567–607.) Plaintiff was represented by an attorney. (*Id.* at 567.)

Plaintiff testified that he was widowed and had four children. (*Id.* at 571.) He lived with his daughter in a house with a one-half flight of stairs, and occasionally had difficulty climbing them. (*Id.* at 572.) Plaintiff did not use any assistive devices such as canes, crutches, walkers, or braces to walk. (*Id.*)

Plaintiff testified that he had a GED and had served in the Navy as a machinist. (*Id.* at 572–74.) Plaintiff testified to difficulty reading and spelling, and stated that these problems had gotten worse since his stroke. (*Id.* at 573.)

Plaintiff said that he had last worked on January 27, 2002, when he was laid off from his job as a truck driver. (*Id.* at 575.) He had filed for and received unemployment benefits. (*Id.* at 575–76.) In the previous fifteen years, Plaintiff had worked as a truck driver, forklift operator, and day laborer for a temporary agency. (*Id.* at 577.) Plaintiff stated that he could not do any of those jobs because they were "just too strenuous," and he could not drive a truck out of fear that he would "run over somebody" due to his anger management problems. (*Id.*)

Plaintiff averred that his most severe physical problems were having no feeling in his feet and legs, which "makes it a little hard to walk." (*Id.* at 578.) Plaintiff attributed this problem to his diabetes. (*Id.*) Plaintiff testified that his lack of feeling in his feet was constant, but that he

also had pain in his feet on occasion. (*Id*. at 578.) Plaintiff said he got a lot of cramps in his legs. (*Id*. at 579.)

Plaintiff stated that he had numbness in both hands up to the wrists. (*Id*. at 580.) He stated that he had experienced numbness in his fingertips for about four years, and "in the last two years it's gone clear through [his] hands." (*Id*. at 581.) Plaintiff attributed this problem to his diabetes. (*Id*.) Plaintiff asserted that his diabetes and other medications made him "a little dizzy" and "lightheaded." (*Id*. at 583.) Plaintiff said he was trying to follow a special diet, and got exercise walking, mainly through shopping. (*Id*.)

Plaintiff testified that he had undergone a cardiac catheterization to "unplug" blood vessels in his chest. (*Id*.) He was currently experiencing no chest pain, but was on a ten-pound lifting restriction following surgery for his stent placement. (*Id*. at 584, 596.) Plaintiff stated that he had been experiencing intermittent chest pain for about a year prior to his catheterization and his stent placement. (*Id*. at 585.)

Plaintiff said that he experienced occasional limping problems as a result of his stroke when he got fatigued. (*Id*.)

As to his anger management problems, Plaintiff related his "road rage" incident, during which he stated he had caught a motorist at a traffic light and "beat the crap out of him" after having been repeatedly cut off. (*Id*. at 586.) Plaintiff testified that he been sent to an anger management class, which had helped. (*Id*. 586–87.) Plaintiff said he took medication for depression, and attended counseling sessions. (*Id*. at 587.) As to the symptoms of his depression, Plaintiff related that he slept a lot, had sleep disturbances, and had previously experienced

thoughts of suicide.  (*Id.* at 588–89.)  Plaintiff also testified to aggravating factors to his suicidal

ideation, including a loss of friends, losing his house, and having a vehicle repossessed.  (*Id.* at

588–89.)

Plaintiff testified that, eight or nine months prior to the hearing, he had provided daycare

for his grandchildren for a period of approximately a month while their parents worked.  (*Id.* at

590.)  As to his daily activities, Plaintiff testified to taking medication in the morning and going

back to sleep for a couple hours, and then playing with and watching his grandson, and watching

television.  (*Id.* at 593.)  Plaintiff acknowledged that he was physically able to dress himself,

shower, trim his beard, make his bed, cook, vacuum, wash dishes and clothes, shop, and drive.

(*Id.* at 594–95.)  In response to the ALJ's questioning, Plaintiff surmised that he could: (1)

normally lift thirty-five pounds without pain or any physical problem; (2) walk about three blocks

at a time; (3) be on his feet for two or three hours at a time depending upon the day; (4) sit

repeatedly for two-hour periods with fifteen-minute breaks in between; (5) crawl on occasion,

although it hurt his knees; (6) lift his arms above his head; (7) pull objects toward him; and (8)

grasp and hold something like a coffee cup.  (*Id.* at 596–600.)

The VE testified at the hearing regarding his review of the vocational exhibits in Plaintiff's

file.  (*Id.* 600–06.)  The VE stated that he would classify Plaintiff's past work as a truck driver

and forklift operator as semi-skilled, medium work.  (*Id.* at 601.)  The VE opined that, in part due

to Plaintiff's age, he did not have any transferable skills to semi-skilled, light, or sedentary work.

(*Id.*)

The VE then opined on a series of hypothetical questions posed by the ALJ. (*Id.* at 601–06.) The ALJ first asked the VE to opine about an individual who was the same age as Plaintiff and had the same education and past relevant work, and who: (1) could lift or carry fifty pounds occasionally and twenty-five pounds frequently; (2) could stand, walk, and/or sit for about six hours in an eight-hour workday; and (3) had no other limitations. (*Id.* at 602.) The VE testified that such an individual could perform both of Plaintiff's past jobs. (*Id.*) The ALJ then asked the VE to opine about an individual who had the same characteristics he had just described, but who additionally could only: (1) "interact appropriately with the public, supervisors and co-workers on a brief and superficial basis;" (2) understand, remember, and carry out two- to three-step instructions; and (3) was able to respond to appropriate changes in a routine work setting only. (*Id.*) The VE opined that such an individual could not perform Plaintiff's past work, but could perform other jobs such as "hand packer packager," dishwasher, or grocery bagger. (*Id.* at 603.)

Next, the ALJ asked the VE to consider an individual with the same vocational profile as Plaintiff who: (1) could lift between thirty-five and fifty pounds occasionally and twenty-five pounds frequently; (2) could stand, walk, and/or sit for about six hours in an eight-hour workday; (3) could engage in push/pull activities with both legs and arms on an occasional basis, with a resistence level of thirty-five pounds; (4) could climb ramps, stairs occasionally, balance occasionally, crouch occasionally, frequently stoop, never climb ladders, ropes, or scaffolds, occasionally kneel, and occasionally crawl; (5) could reach above overhead level on a repetitive basis; (6) could engage in gross and fine manipulation on a repetitive basis; (7) should avoid

concentrated exposure to temperature extremes; (8) could interact appropriately with the public, supervisors, and co-workers on a brief and superficial basis; (9) understand, remember, and carry out two- to three-step instructions; and (10) be able to respond to appropriate changes in a routine work setting only. (*Id*. at 604.) The VE opined that such an individual could not perform Plaintiff's past work, but could still perform the jobs of grocery bagger and dishwasher. (*Id*.)

Lastly, the ALJ asked the VE to consider an individual with the same age, education, and past work experience as Plaintiff, but with all the symptoms that Plaintiff had testified to during the hearing. (*Id*. at 605.) The VE opined that such an individual would not be able to perform either his past work or any other work as a result of numbness in his feet and hands. (*Id*. at 605.)

On December 28, 2005, the ALJ issued a decision reflecting his finding that Plaintiff was not disabled within the meaning of the Social Security Act because Plaintiff retained the capacity to perform certain medium work. (*Id*. at 18–26.) In reaching his decision, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since January 27, 2002. (*Id.* at 20.) The ALJ next determined that Plaintiff's diabetes, knee problem, the effects of his stroke, his heart problem, and his depression were medically determinable, severe impairments. (*Id*.) Despite their severity, the ALJ determined that these impairments were not sufficiently severe to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations Number 4. (*Id*. at 21.) Additionally, the ALJ found that "the claimant's statements concerning the intensity, duration, and limiting effects of [his] symptoms [were] not entirely credible." (*Id*. at 22.)

Based on the evidence presented, the ALJ concluded that Plaintiff had the RFC to perform medium work. (*Id*.) Specifically, the ALJ found that Plaintiff: (1) could lift and carry between

thirty-five and fifty pounds occasionally and twenty-five pounds frequently; (2) could stand, walk, and/or sit for about six hours in an eight-hour workday; (3) could engage in push/pull activities with both legs and arms on an occasional basis, with a resistence level of thirty-five pounds; (4) could engage in overhead reach and gross and fine manipulation with both arms on greater than a repetitive basis; and (5) must avoid concentrated exposure to extreme heat and cold. (*Id.* at 21.) With respect to his mental capacity, the ALJ found Plaintiff could: (1) interact appropriately with the general public, supervisors, and co-workers on at least a brief and superficial basis; (2) remember and carry out two- to three-step instructions; and (3) respond appropriately to changes in a routine work environment. (*Id.* at 22.) In accord with this RFC determination, the ALJ determined that Plaintiff could perform such work as a dishwasher or grocery bagger and, therefore, was not disabled. (*Id.* at 25.)

On December 20, 2006, the Appeals Council affirmed the ALJ's decision, making it the final administrative decision for the purposes of judicial review. (*Id.* at 6–8.) On February 15, 2007, Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability insurance and supplemental security income benefits. (Compl. [filed Feb. 15, 2007].) On July 13, 2007, Plaintiff filed his opening brief. (Pl.'s Br.) On August 10, 2007, the Commissioner filed his response. (Def.'s Resp. Br. [filed Aug. 10, 2007] [hereinafter "Def.'s Resp."].) Plaintiff never replied. This matter is ripe for review.

# ANALYSIS

## *1.*     *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of the Commissioner's denial of disability insurance benefits and supplemental security income benefits. *See* 42 U.S.C § 1383(c)(3) (2006) (incorporating review provisions of 42 U.S.C. § 405[g]). Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations.

42 U.S.C § 405(g) (2006). Thus, this court's review is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision. *See id.*; *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992). The court must uphold the Commissioner's decision if it is supported by substantial evidence. *See Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). This court cannot reweigh the evidence nor substitute its judgment for that of the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987). That does not mean, however, that my review is merely cursory. To find that the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant evidence that a reasonable person might deem adequate to support the ultimate conclusion. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if

it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

**2.      *Evaluation of Disability***

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meet the insured status requirements, be less than sixty-five years of age, and be under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In proving disability, a claimant must make a *prima facie* showing that he is unable to return to the prior work he has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability insurance benefits. *See* 20 C.F.R. § 404.1520 (2008); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing the five-step analysis). A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be

disregarded. *See* 20 C.F.R. § 404.1520(a) (2008); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that he is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b) (2008). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits his physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled. *Id.* § 404.1520(d). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents him from performing work he has performed in the past. *See Williams*, 844 F.2d at 751 (citations omitted). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(f) (2008); *Williams*, 844 F.2d at 751. The fifth step requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy. *See* 20 C.F.R. § 404.1520(g) (2008); *Williams*, 844 F.2d at 751.

### 3.    *Disability Determination*

Plaintiff argues that the ALJ's determination of non-disability was erroneous because: (1) his credibility assessment of Plaintiff's testimony was not supported by substantial evidence; (2) he failed to give controlling weight to the opinion of Plaintiff's treating physician or to explain what weight he gave to other physicians; and (3) his RFC determination was not supported by substantial evidence. (Pl.'s Br. at 21–46.) I assess each argument in turn.

### a.      *Credibility Assessment of Plaintiff's Testimony*

"Credibility is the province of the ALJ."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1376

(10th Cir. 1992) (citation and quotation marks omitted).  Credibility determinations made by an

ALJ are generally considered binding upon review.  *Gossett v. Bowen*, 962 F.2d 802, 807 (10th

Cir. 1988).  Such determinations "should not be upset if supported by substantial evidence."

*White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001).

In a meandering discussion that defies all organizational logic, Plaintiff contends that the

ALJ's assessment of his credibility was erroneous for dozens of half-articulated, underdeveloped

reasons, including that: (1) the ALJ did not specify which portions of Plaintiff's testimony he

found less than credible; (2) the ALJ did not explicitly discuss *each* of the factors that may be

considered in a credibility assessment as set forth in the regulations; and (3) the ALJ erred with

respect to some of those factors he *did* consider.  (*See* Pl.'s Br. at 21–29.)  The Commissioner

contends that the ALJ provided ample explanation for his credibility determination.  (*See* Def.'s

Resp. at 23–25.)  For the reasons set forth below, I agree with the Commissioner.

First, Plaintiff's protestations to the contrary notwithstanding, I find that the ALJ

adequately specified those portions of Plaintiff's testimony which he found not completely

credible.  In the applicable section of his decision, the ALJ first presented a summary of the

symptoms Plaintiff reported at the hearing, including Plaintiff's claimed memory problems and his

alleged constant numbness in his hands and feet.  (*See* Admin R. at 22.)  The ALJ then stated that

he found Plaintiff's "statements concerning the intensity, duration and limiting effects of these

symptoms . . . not entirely credible."  (*Id.*)  As support for this assessment, the ALJ cited such

contrary medical evidence as Dr. Valette's psychological evaluation which had found no signs of memory impairment and only mild decreased memory function in one area, and Dr. Garnard's psychiatric review technique form which had noted only mild restriction on the activities of daily living, moderate difficulty maintaining social functioning, and moderate difficulty in maintaining concentration, persistence, and pace. (*Id.* at 22–23.) With respect to Plaintiff's alleged physical limitations, including constant numbness in his hands and feet, the ALJ cited such contrary evidence as: (1) physical therapy records showing that Plaintiff had regained normal ambulation and gait just months after his stroke; (2) evidence suggesting that Plaintiff had not taken prescribed pain medication for his knee; (3) the fact that Plaintiff had been laid off from his job as a truck driver for reasons unrelated to his alleged disability; (4) the fact that Plaintiff had applied for and received unemployment benefits following his termination from work; (5) Plaintiff's hobby of shooting guns, which he "apparently did . . . competitively up until just rather recently;" and (6) Plaintiff's efforts caring for and watching his grandchildren. (*Id.* at 23–24); *see also Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988) (noting that "compatibility of non-medical testimony with objective medical evidence" may be considered in assessing credibility). With respect to this last factor, the ALJ noted that Plaintiff's care for his grandchildren also "demonstrates that he is first of all reliable despite his complaints concerning memory and other problems," and concluded that such care contradicted his allegations regarding anger control problems "as he still watches the children without any reported frustration or anger control problems." (*Id.* at 24.) On the basis these explanations, I find that the ALJ supported his credibility assessment of Plaintiff's testimony with substantial evidence.

In counseling against the above conclusion, Plaintiff adumbrates dozens of underdeveloped, poorly organized arguments, two of the most cogent of which I shall briefly address. First, Plaintiff suggests that the ALJ erred by not discussing *each* of the factors that may be considered in a credibility assessment under 20 C.F.R. §§ 404.1529(c), 416.929(c). (*See generally* Pl.'s Br. at 21–29.) Plaintiff relies heavily on *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995), for this proposition, but I find such reliance misplaced as a subsequent Tenth Circuit decision clarified that, "*Kepler* does not require a formalistic factor-by-factor recitation of the evidence." *White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2001). Instead, as the Tenth Circuit held, "[s]o long a the ALJ sets forth specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied." *Id.* (citation and quotation marks omitted). In the instant case, the ALJ clearly met this requirement, so his failure to discuss *other* factors that could have affected his credibility assessment is irrelevant.

Second, Plaintiff suggests that the ALJ erred by basing his credibility determination — at least in part — upon purported misreadings of the evidence, including his purportedly mistaken assumptions that Plaintiff: (1) may have no incentive to work due to eligibility for VA benefits; and (2) had "recently" cared for his grandchildren and "recently" shot guns. (*See* Pl.'s Br. 25–28.) The Commissioner concedes that the ALJ's credibility assessment may have contained errors with respect to some of these assumptions, but argues that "these errors . . . do not outweigh the numerous valid factors cited in the decision . . . that detract from the credibility of Plaintiff's allegations." (*See* Def.'s Resp. at 21.) I agree with the Commissioner. First, it is not at all obvious to this court that the ALJ *did* err with respect to all of his purportedly mistaken

assumptions,[7] and I find resolving this question would require precisely the type of reweighing of

the evidence that is not appropriate in the instant review. *See, e.g.*, *Hamilton*, 961 F.2d at

1497–98 (stating that district court's review is limited to determining whether the record as a

whole contains substantial evidence supporting the Commissioner's decision). Second, even

assuming the ALJ *did* err with respect to some these specific, isolated findings, I find any such

error harmless in light of the multiple, *other* well-supported reasons the ALJ provided for finding

Plaintiff's testimony not entirely credible. *See, e.g.*, *Bar MK Ranches v. Yuetter*, 994 F.2d 735,

740 (10th Cir. 1993) (stating that harmless error rule applies to judicial review of administrative

proceedings).

      For the foregoing reasons, I find that the ALJ's credibility assessment of Plaintiff's

testimony is supported by substantial evidence.

      **b.**       ***Failure to Give Controlling Weight to Plaintiff's Treating Physician, or to Adequately Explain the Weight Afforded to Other Physicians***

      It is well established that an ALJ is required to give controlling weight to a treating

physician's opinion, so long as it is well supported by medically acceptable clinical and laboratory

diagnostic techniques and not inconsistent with other substantial evidence of record. *See* 20

C.F.R. § 404.1527(d)(2) (2008); *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004).

Should an ALJ choose to disregard the opinion of a treating physician, the ALJ must set forth

---

      [7]For instance, I find that the record may be fairly read to suggest that Plaintiff *had* recently
shot guns, and *had* recently cared for his grandchildren. (*See* Admin R. at 591–92 [Plaintiff
claiming that he had last competitively shot two years prior to the hearing, but also
acknowledging that he had "shot since then"]; *id*. at 593 [Plaintiff relating that his daily activities
consisted of playing with his grandson and "kind of" watching him].)

"specific, legitimate reasons" for doing so. *Hamlin*, 365 F.3d at 1215 (citation and quotation marks omitted). In the instant case, Plaintiff contends that the ALJ erred in not giving controlling weight to certain opinions expressed in the cover letter attending Dr. McCollum's transmission of Plaintiff's medical records to the Commissioner. (*See* Pl.'s Br. at 29–36.) For the reasons set forth below, I disagree.

In her November 3, 2003, cover letter attending the transmission of Plaintiff's treatment records from 1998 to early 2002, Dr. McCollum wrote that, as a result of his May 2003 stroke, Plaintiff had "some problems with his sense of balance and some short-term memory problems" and opined that "[h]is memory difficulties make learning an entirely new trade problematic." (Admin R. at 237.) Reviewing this assessment in his opinion, the ALJ called Dr. McCollum's allusion to Plaintiff's balance and memory problems "vague and inconsistent with the record," and pointed to evidence suggesting that Plaintiff had regained normal extremity strength and gait following his stroke, and psychological testing revealing that he had low-average memory. (*Id.* at 24.) Plaintiff apparently faults the ALJ for this determination, arguing that Dr. McCollum's assessment of his balance and memory problems was not inconsistent with other substantial evidence on record, and thus should have been afforded controlling weight. (*See* Pl.'s Br. at 29–36.)

Upon review, I find that the ALJ provided "specific, legitimate reasons" for declining to give Dr. McCollum's opinion controlling weight. *Hamlin*, 365 F.3d at 1215. First, I find that the ALJ's characterization of Dr. McCollum's assessment as "vague" can only be read to suggest that this assessment was unsupported by medically acceptable clinical and laboratory diagnostic

techniques on the facts of this case. Dr. McCollum's treatment records end more than a year *prior* to Plaintiff's stroke, and the cover letter itself provides no indication as to any objective basis for Dr. McCollum's conclusion that Plaintiff was experiencing balance or memory problems as a result of his stroke. (*See* Admin R. at 237); *see also White*, 287 F.3d at 907 (finding no error in ALJ's rejection of treating physicians' assessments which "did not indicate they were the product of an examination"). Moreover, the cover letter *itself* suggests that Dr. McCollum had limited personal familiarity with the salient facts surrounding Plaintiff's stroke, as the letter calls this stroke an "ill-defined intra-cranial event," and contains a handwritten correction to reflect the fact that this stroke had occurred a few "months" — rather than a few "years" — prior to Dr. McCollum's writing of the letter. (Admin R. at 237.) While I agree that the ALJ could have been clearer in explaining that Dr. McCollum's assessment was "vague" because it had failed to suggest *any* acceptable clinical and laboratory diagnostic techniques on which it could have been based, I cannot agree that the ALJ's failure to do so was erroneous.

Second, I likewise find the ALJ adequately demonstrated how Dr. McCollum's assessment was inconsistent with other substantial evidence on record. In explaining his rejection of Dr. McCollum's "vague" assessment, the ALJ referred to evidence showing normal extremity strength and gait following Plaintiff's stroke, and psychological testing revealing low-average memory. (*Id.* at 24.) Plaintiff argues that such evidence is not inconsistent with Dr. McCollum's assessment because "gait" is not identical to "balance," and because certain findings in Dr. Valette's psychological evaluation arguably demonstrate a memory impairment. (*See* Pl.'s Br. at 31–33.) I disagree. Semantic subtleties notwithstanding, I find that evidence pertaining to

Plaintiff's "strength" and "gait" following his stroke is sufficiently probative of his "balance" to demonstrate inconsistency with Dr. McCollum's assessment. Likewise, I find that the overall gravamen of Dr. Valette's psychological evaluation — particularly the doctor's conclusion that Plaintiff had "average range across the board on all areas of memory functioning" except one — justifies the ALJ's conclusion that this report was inconsistent with Dr. McCollum's assessment. (Admin R. at 209.) Accordingly, I find that the ALJ offered a second specific and legitimate reason for rejecting Dr. McCollum's assessment — namely, the inconsistency between this assessment and other substantial evidence on record. *See* 20 C.F.R. § 404.1527(d)(2) (2008).

Lastly, Plaintiff faults the ALJ for not explicitly stating what weight he was affording to other physicians on record, including Drs. Soule, Valette, and the unnamed state agency physician who had completed Plaintiff's first physical RFC assessment and found postural limitations. (*See* Pl.'s Br. at 36–37.) I find no such error. With respect to Dr. Valette, the ALJ clearly gave his assessment of Plaintiff's alleged memory impairment greater weight than that afforded to Dr. McCollum, as discussed above.[8] With respect to Dr. Soule, the ALJ explicitly gave his mental RFC assessment less weight than the mental RFC assessment completed by Dr. Garnard, because, as the ALJ stated, he found Dr. Garnard's assessment "consistent with the record and . . . *the*

---

[8]Plaintiff also apparently argues that the ALJ erred in not explicitly considering each of the factors enumerated in 20 C.F.R. § 404.1527(d) in determining the weight to afford to Dr. McCollum's opinion, even though he decided not to afford it controlling weight. (*See* Pl.'s Br. at 34–35.) I note that such a formalistic assessment is not required. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) ("Ms. Oldham cites no law, and we have found none, requiring an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion.").

*most favorable to [Plaintiff]*."[9]  (Admin R. at 23 [emphasis added].)  Finally, I find that the ALJ's

failure to afford any explicit weight to the unnamed state agency physician who had found

postural limitations in Plaintiff's first physical RFC assessment is harmless.  During the hearing,

the ALJ included such postural limitations in the hypothetical posed to the VE which had elicited

the response that Plaintiff could perform the jobs of dishwasher and grocery bagger.  (*See id.* at

604.)  This are the same jobs the ALJ found Plaintiff could perform.  (*See id.* at 25.)  As such, I

find that the ALJ's failure to afford explicit weight to this assessment — or to integrate the

postural limitations into his RFC — was at most harmless.  *See, e.g., McAnally v. Astrue*, 241 F.

App'x 515, 519 (10th Cir. 2007) (finding failure to afford weight to state agency physician

harmless where, even if his limitations had been considered and integrated into the RFC, such

limitations would still not have affected the jobs the ALJ found the claimant could perform).

   Accordingly, I find that the ALJ properly allocated weight to the various physicians on

record, and adequately explained his rationale in so doing.

_____

[9]Remarkably, Plaintiff attempts to fault the ALJ even for this act of magnanimity by
suggesting that Dr. Soule's mental RFC assessment was actually favorable to him because this
assessment found one or two episodes of decompensation, whereas Dr. Garnard's did not.  (*See*
Pl.'s Br. at 36.)  This argument ignores the fact that Dr. Soule's assessment also, dispositively,
found that Plaintiff's mental impairments were "not severe."  (Admin R. at 333.)  Moreover, even
assuming the ALJ should have considered this one finding from Dr. Soule's report in isolation, I
find that Plaintiff has failed to even argue — and *a fortiori* has failed to prove — how this finding
is purportedly inconsistent with the mental limitations provided in Plaintiff's RFC.  (*See* Analysis
§3[c][i], *infra*.)

### c. Failure to Support RFC Determination with Substantial Evidence

Finally, Plaintiff contends that the ALJ failed to support his RFC determination with substantial evidence. (*See* Pl.'s Br. at 37–47.) In a nearly incomprehensible argument, Plaintiff appears to assert that the ALJ erred in: (1) not including greater mental limitations in his RFC; and (2) not adequately explaining the bases of the physical limitations he included in his RFC. (*See id.*) At least to the extent that Plaintiff's argument may be deciphered, I analyze it in two parts as follows.

### i. Mental Limitations in RFC

In his RFC, the ALJ found that Plaintiff "is able to understand, remember and carry-out [two- to three-]step instructions, interact appropriately with the general public, supervisors and co-workers on at least a brief and superficial basis and respond appropriately to changes in a routine work environment only." (Admin R. at 21–22.) As justification for this determination, the ALJ cited, *inter alia*: (1) Dr. Valette's report that had found no signs of memory impairment and only mild decreased memory function in one area; (2) family and financial factors that had apparently contributed to Plaintiff's "road rage" incident; (3) Dr. Garnard's mental RFC assessment that had found only mild restriction on the activities of daily living, moderate difficulty maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace; and (5) Dr. Garnard's finding of no episodes of decompensation. (*Id.* at 22.) Given this explanation, I find the ALJ supported the mental limitations in his RFC with substantial evidence.

Plaintiff apparently disputes foregoing conclusion, obliquely contending that the ALJ erred by: (1) misreading Dr. Valette's report; (2) not adopting the findings of Dr. Garnard's report in sufficient detail; and (3) not considering the one or two episodes of decompensation found in Dr. Soule's report. (Pl.'s Br. at 38–41.) For the following reasons, I disagree.

With respect to Dr. Valette's report, Plaintiff suggests that the ALJ erred by not discussing the doctor's findings that Plaintiff had a global assessment of functioning ("GAF") score of between forty-five and fifty during his examination, and by ignoring specific facts from the doctor's report indicating that Plaintiff was depressed. (*See id.* at 38–39.) I find no such error. First, Plaintiff has failed to discuss, and therefore has failed to prove, how consideration of such factors would or should have mandated different mental limitations in his RFC.[10] (*See id.*) The ALJ explicitly found Plaintiff to be depressed in step two of the five-step process, and the mental limitations in his RFC *already* reflect the ALJ's assessment that Plaintiff had a diminished capacity to remember and carry out detailed instructions, interact appropriately around other people, and react to other than routine changes in his work environment. (*See* Admin R. at 20, 21–22.) Because I find no obvious contradiction between the factors Plaintiff cites and the mental limitations the ALJ imposed, I decline to invent *sua sponte* such a disjunction for Plaintiff.

---

[10]In a single, unpersuasive sentence, Plaintiff hints that his GAF score is inconsistent with *any* type of work because this score indicates "serious symptoms," which, in turn, can include problems with "social, occupational, or school functioning." (*See* Pl.'s Br. at 39 [quoting AMERICAN PSYCHOLOGICAL ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 2000) (hereinafter "DSM–IV")].) As the Commissioner points out, however, "[a] GAF score is a snapshot of a condition at one point in time, and is not a longitudinal indicator of one's overall level of function." (Def.'s Resp. at 8 n.5 [citing DSM–IV at 30–32].)

Moreover, in the absence of persuasive argumentation on how his RFC determination would or should have been different had the ALJ explicitly adopted all the findings in Dr. Valette's report, I cannot agree with Plaintiff's unelaborated suggestion that the ALJ impermissibly chose facts from the doctor's report that supported his nondisability determination while ignoring those facts that did not. (*See* Pl.'s Br. at 39.) In short, because Plaintiff has failed to persuasively demonstrate *any* disjunction between Dr. Valette's report and his RFC determination, I cannot agree that the ALJ's decision to simply recite the main findings of Dr. Valette's report as opposed to the multiple facts on which they were based was erroneous.

With respect to Dr. Garnard's mental RFC assessment, Plaintiff apparently faults the ALJ with the same error, suggesting that the ALJ should have discussed the doctor's findings in greater detail. (*See* Pl.'s Br. at 40–43.) Plaintiff intimates that the ALJ might have imposed different mental limitations in his RFC had he considered and adopted the findings in Dr. Garnard's mental RFC assessment, as opposed to just the findings in Dr. Garnard's psychiatric review technique form. (*See id.*) I remain unconvinced. First, Plaintiff's entire "argument" consists of the recitation of apparently random facts culled from Dr. Garnard's mental RFC assessment, and his conclusory allegation that these facts support unspecified "attention, concentration, and pace" restrictions that were not included in his RFC. (*See id.* at 40–41.) While the vagueness of this argument almost precludes meaningful review, I find that, at a minimum, it fails to specify the *specific* limitations Plaintiff claims were warranted, much less how the specific *evidence* he claims was ignored would have *mandated* such limitations. Absent such indispensable exposition, I cannot find that the ALJ's failure to analyze every fact mentioned in

Dr. Garnard's report was erroneous. Moreover, I find that Plaintiff's only reasonably specific

argument — namely, that Dr. Garnard's finding that Plaintiff "should have minimal to no

interaction with the general public" should have precluded him from work as a grocery bagger —

fails to demonstrate reversible error. (*See id.* at 41 [citing Admin R. at 212].) First, Dr.

Garnard's proposed limitation *already* appears integrated into Plaintiff's RFC via the limitation

that he may only interact with the general public, supervisors, and coworkers on "a brief and

superficial basis." (Admin R. at 22.) Second, the only prejudice Plaintiff identifies as flowing

from the ALJ's omission of *greater* limitations on his interactions with the general public is his

unsupported supposition that such limitations would have precluded him from work as a grocery

bagger. (*See* Pl.'s Br. at 41–42.) Significantly, Plaintiff does not even *contend* that such a

limitations would have precluded him from work as a *dishwasher.* (*See id.*) As such, because I

find that any failure by the ALJ to include *greater* limitations upon Plaintiff's ability to interact

with the general public would *not* have affected his ability to perform at least *one* of the jobs that

the ALJ found he could perform, I find that any error on the part of the ALJ in omitting such

greater limitations was harmless.

Lastly, Plaintiff contends that the ALJ erred in finding that he had experienced "no periods

of decompensation" when Dr. Soule had explicitly found one or two such episodes in his mental

RFC assessment. (*Id*. at 43.) While I agree that the ALJ apparently overlooked this finding from

Dr. Soule's report in his haste to adopt Dr. Garnard's mental RFC assessment as *more favorable*

*to Plaintiff,* I cannot agree that this oversight was erroneous. First, Plaintiff has again failed to

show how a finding of one or two episodes of decompensation is inconsistent with the mental

limitations in his RFC, or to cite *any* law suggesting that such episodes need always be integrated

into an RFC. (*See id.*) Second, I note that the ALJ did discuss — *at length* — the only obvious

episode of decompensation upon which Dr. Soule's findings could conceivably have been based:

Plaintiff's "road rage" incident.[11] The ALJ described this incident, and noted that family and

financial problems had apparently exacerbated Plaintiff's reaction thereto. (Admin R. at 23.)

Likewise, in a separate part of his opinion, the ALJ discussed how Plaintiff's claimed anger

management problems were belied by evidence of his care for his grandchildren. (*Id.* at 24.)

Thus, because (1) Plaintiff has failed to show how Dr. Soule's finding of one or two episodes of

decompensation is inconsistent with the mental limitations in his RFC, (2) Plaintiff has failed to

cite any law suggesting that such episodes need always be integrated into an RFC, and (3) the

ALJ apparently considered — and largely discounted — the *only* episode of decompensation

upon which Dr. Soule's findings could conceivably have been based, I find no error in the ALJ's

failure to discuss this specific finding from Dr. Soule's otherwise entirely unsympathetic mental

RFC assessment of Plaintiff.

For the foregoing reasons, I find that the mental limitations the ALJ imposed in Plaintiff's

RFC were supported by substantial evidence.

---

[11]Dr. Soule does not explain the source of his finding that Plaintiff had experienced one or two episodes of decompensation; he merely marks a preprinted box reflecting this finding. (*See* Admin R. at 343.)

### ii. *Physical RFC*

With respect to Plaintiff's physical limitations, the ALJ found that Plaintiff could: (1) lift and carry between thirty-five and fifty pounds occasionally, and twenty-five pounds frequently; (2) stand, walk, and/or sit for about six hours in an eight-hour workday; (3) engage in push/pull activities with both legs and arms on an occasional basis, with a resistence level of thirty-five pounds; (4) engage in overhead reach and gross and fine manipulation with both arms on greater than a repetitive basis; and (5) must avoid concentrated exposure to extreme heat and cold.  (*Id.* at 21.)  In support of this assessment, the ALJ cited, *inter alia*: (1) Plaintiff's testimony that he could lift thirty-five pounds normally; (2) Plaintiff's testimony that he could sit for hours at a time; (3) Plaintiff's testimony that he could reach overhead for short time periods; (4) Plaintiff's testimony that he could grasp things; and (5) physical RFC assessments completed by state agency physicians which had found Plaintiff could perform an even *greater* range of work.  (*Id.* at 23–24.)  As the ALJ explained:

> The basis for the [physical] residual functional capacity is from [Plaintiff's] own admissions of what he can do.  The undersigned further notes that the residual functional capacity is generally consistent with the findings by the State Agency. The undersigned notes the nonexamining experts at the State Agency determined he could [do] a greater range of medium work.  However, the undersigned has given [Plaintiff's] reported limitations more weight which accounts for the reduced range of medium work.

(*Id.* at 24 [internal citation omitted].)  On the basis of this explanation, I find the ALJ has supported the physical limitations in Plaintiff's RFC with substantial evidence.

In counseling against the above conclusion, Plaintiff does not even contend that any of the ALJ's specific findings were erroneous.[12]  (*See* Pl.'s Br. at 43–46.)  Instead, bizarrely, Plaintiff appears to fault the ALJ for not specifying *which* of the physical limitations in his RFC reflect Plaintiff's own testimony, and *which* derive solely from the state agency physicians' physical RFC assessments.  (*See id.*)  In a questionably coherent discussion that implicitly asks the court to reweigh the evidence, Plaintiff charges that certain physical limitations included in his RFC — including the finding that Plaintiff could stand, walk, or sit for six hours in an eight hour workday — conflict with *some* of Plaintiff's testimony, including testimony that "his most comfortable position is lying down with his feet elevated."  (*Id.* at 44–45.)  Such "argumentation" is frankly irrelevant to the question of whether the ALJ's determination was supported by substantial evidence, and is moreover unavailing in light of the ALJ's credibility assessment.  In short, because Plaintiff fails to suggest how *any* objective medical evidence conflicts *any* of the physical limitations in his RFC, I decline to engage this unconvincing argument further.

Accordingly, for the foregoing reasons, I find that the physical limitations in Plaintiff's RFC were supported by substantial evidence.

---

[12]Plaintiff does make one frivolous argument that there was insufficient evidence to support the ALJ's conclusion that he could lift twenty-five pounds frequently because both of the poorly photocopied physical RFC assessments on record appear to rate Plaintiff's lifting capacity at twenty, rather than twenty-five, pounds.  (*See* Pl.'s Br. at 43–44.)  As the Commissioner correctly points out, however, these physical RFC assessments were completed on standard Social Security Administration forms, and the poorly copied line in question always reads: "[twenty-five] pounds."  (*See* Def.'s Resp. at 13 n.9.)

**4.      *Conclusion***

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is

AFFIRMED.

Dated this 26th day of March, 2008.


                                        BY THE COURT:


                                        s/ Edward W. Nottingham
                                        EDWARD W. NOTTINGHAM
                                        Chief United States District Judge